**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

GLENN M. WILT; SANDRA S. WILT,
<u>Plaintiffs-Appellants,</u>

v.

No. 97-2726

STATE AUTOMOBILE MUTUAL
INSURANCE COMPANY,
<u>Defendant-Appellee.</u>

GLENN M. WILT; SANDRA S. WILT,
<u>Plaintiffs-Appellants,</u>

v.

No. 98-2403

STATE AUTOMOBILE MUTUAL
INSURANCE COMPANY,
<u>Defendant-Appellee.</u>

Appeals from the United States District Court
for the Northern District of West Virginia, at Martinsburg.
W. Craig Broadwater, District Judge.
(CA-95-60-3)

Argued: January 26, 1999

Decided: January 18, 2000

Before NIEMEYER and LUTTIG, Circuit Judges, and
Robert E. PAYNE, United States District Judge
for the Eastern District of Virginia, sitting by designation.

_____

Affirmed by unpublished per curiam opinion. Judge Luttig joined
only in the judgment.

**COUNSEL**

**ARGUED:** John W. Cooper, COOPER & PRESTON, Parsons, West Virginia for Appellants. James Carson Stebbins, HUDDLESTON, BOLEN, BEATTY, PORTER & COPEN, Charleston, West Virginia, for Appellee. **ON BRIEF:** John R. Fowler, HUDDLESTON, BOLEN, BEATTY, PORTER & COPEN, Charleston, West Virginia, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Glenn and Sandra Wilt instituted this removed action against their insurer, State Automobile Insurance Company ("State Auto"), seeking damages on several theories only two of which are at issue in this appeal: (1) a common law claim for alleged bad faith settlement practices; and (2) a claim for attorneys fees, economic loss and annoyance damages in their coverage litigation against State Auto. The district court granted summary judgment for State Auto on both claims and this appeal followed. For the reasons which follow, we affirm the district court's grant of summary judgment in favor of State Auto.

I.

This action involves the automobile insurance available to recompense injuries sustained in an accident that took place on May 3, 1986. Not long after the accident, there began a rather lengthy, but halting, course of negotiations and litigation, the details and sequence of which are significant to the resolution of the appeal. Hence, it is necessary to recount the somewhat tortuous series of events following the tragedy.

2

A. The Accident and the Early Developments

The Wilts sustained serious injuries in an automobile accident on May 3, 1986, when Charles W. Nickleson, Jr. drove his automobile across the center line of the highway and collided head-on with the Wilts' truck. Nickleson's seven year old son, Charles W. Nickleson, III, and Lori Stokely Hall were passengers in the Nickleson vehicle at the time of the collision. Both Nickleson, Jr. and his son were killed in the accident.

State Auto was the liability insurance carrier for both Charles W. Nickleson, Jr. and the Wilts. The Nickleson policy established liability coverage of $100,000 per accident. The Wilt policy provided liability coverage of $50,000 per accident and an underinsured ("UIM") coverage of $50,000. The Wilt policy insured four vehicles and the total policy premium was reduced by virtue of a multi-car discount. The Wilt policy also contained an "anti-stacking" clause which provided that "[t]he limit of liability applicable to ... Underinsured Motorists Coverage is the most we will pay regardless of the number of ... vehicles or premiums shown in the Schedule or in the Declarations." J.A. 75.[1]

In early June 1986, approximately one month after the accident, State Auto concluded that Nickleson's negligence caused the accident and, as of June 11, 1986, State Auto was of the view that "medicals will surely exceed the 100,000 limits" of Nickleson's policy. J.A. 112. Consequently, on July 7, 1986, State Auto paid $3,000 of Nickleson's liability coverage in satisfaction of Glenn Wilt's property damage claim; and on July 17, 1986, the insurer informed the Wilts and the other interested parties -- Lori Stokely Hall and the estate of Charles W. Nickleson, III -- that the remainder of the Nickleson liability policy ($97,000) was immediately available for distribution. J.A. 109. To that end, State Auto requested the claimants, including the Wilts, to agree upon the amount to be distributed to each. However, they were

_____

[1] Although this appeal does not involve uninsured motorist coverage, some of the arguments and some of the decisional law draw upon principles respecting uninsured motorist coverage. Reference to that kind of insurance coverage will be "UM."

3

unable to agree on the proper division of the $97,000 balance of Nickleson's liability coverage.

Because Mrs. Wilt was very seriously injured, it soon became obvious that her medical expenses alone would make her claim the largest of those claiming against the Nickleson policy and that the total of all claims would exceed the remaining $97,000 of Nickleson's coverage. Therefore, the first-party UIM coverage of the Wilts' State Auto policy also came into play.

B. The Developments: September 1986 to April 1988

On September 24, 1986, the Wilts retained John Skinner to represent their interests against Nickleson's estate and against State Auto. One month later, on October 29, 1986, a State Auto field claims representative communicated to Skinner the view of State Auto respecting its obligation under the Wilts' UIM coverage. Citing both the West Virginia Code and a decision of the Supreme Court of Appeals of West Virginia, State Auto took the positions that:

> (1) the Wilts were not entitled to "stack" the $50,000 limit of their UIM coverage for each of the four vehicles covered under their policy, i.e., the Wilts could not recover $200,000 under their UIM policy (4 x $50,000); and (2) the Wilts could recover the UIM benefits of $50,000 "only if the single limit of $100,000, under Mr. Nickleson's policy is exhausted first[, and] [i]f it is not exhausted first then the remaining liability coverage of Mr. Nickleson's policy will offset the $50,000 [UIM] coverage on the Wilt's [sic] policy."

J.A. 113.[2] In other words, State Auto took the view that the Wilts' policy afforded a maximum of $50,000 in UIM coverage and, further, that the Wilts would be entitled to UIM benefits if, and only to the
_____

[2] State Auto's in-house counsel had communicated this view to the company's adjusters by memorandum dated October 17, 1986 based on West Virginia statutes, the policy language and the decision in Shamblin v. Nationwide Mut. Ins. Co., 332 S.E.2d 639 (W. Va. 1985).

4

extent that, their UIM coverage exceeded the amount available to them under the Nickleson liability policy.

On September 1, 1987, Skinner advised State Auto's counsel that he and counsel for the other two claimants (subject to approval of their clients) had agreed upon a mode of dividing the remaining $97,000 of Nickleson's liability coverage. The sums to be paid each claimant were not disclosed, but it was proposed that the Wilts were to give an unspecified credit on their claim against Nickleson's estate. J.A. 223. The record does not disclose the subsequent discussions, if any, respecting that proposal.[3] However, it apparently did not meet with State Auto's approval because, in February 1988, State Auto filed an interpleader action in the state court to secure instruction how to distribute the $97,000 balance of Nickleson's liability coverage, J.A. 53-57.[4] In September 1988, State Auto deposited the $97,000 with the state court.

It was not until three years later, on December 2, 1991, that the claimants finally agreed upon the proper distribution of Nickleson's liability coverage and the state court entered an Agreed Order. Pursuant to that order, the $97,000 balance of Nickleson's liability policy was distributed as follows: (i) $9,700 to the estate of Nickleson's son; (ii) $22,700 to Lori Stokely Hall, the other passenger in Nickleson's

_____

[3] An internal State Auto communication dated January 15, 1988, reflects that State Auto was receiving telephone communications from a lawyer (Cummings) for one of the other claimants asking that settlement checks on the Nickleson policy be issued. That communication reflects that of the $97,000 available "the Wilts are to receive 40% ($38,000) and the other two claimants were to receive 30% each ($29,500)." The communication also poses the question: "Can we go ahead w/settlement under the Nickleson file & let Atty Skinner keep his UM claim under the Wilt file open?" J.A. 224.

[4] The February 1988 date comes from the parties' briefs and the district court's opinion; however, the copy of the interpleader complaint in the Joint Appendix is date-stamped August 29, 1988. This date stamp appears to have been the product of inadvertence, and, like the parties, we assume that it does not signify a filing date. Indeed, other communications between the parties in the record indicate that McCune in fact filed the interpleader action, as we now are told, in February 1988. See, e.g., J.A. 114.

car; and (iii) $64,600 to the Wilts.**5** Further, and notwithstanding the dubious liability of Mr. Wilt for the collision with Nickleson's vehicle, State Auto contributed to Lori Stokely Hall's settlement the entire $50,000 liability limits of the Wilts' policy thereby leaving all UIM coverage -- whatever it turned out to be -- available for the Wilts. J.A. 128-29. State Auto released Nickleson's estate of any further liability and State Auto waived any right of subrogation it had against the estate.

Also in early 1988, Skinner, counsel for the Wilts, and counsel for State Auto began discussions about the availability and amount of UIM coverage under the Wilts' policy. On that topic, the parties held widely divergent views. The record respecting the early discussions about UIM coverage is less than clear, but piecing together the developments from the record, it appears that discussions began on February 24, 1988, J.A. 114, 116. And, the district court found that, in February 1988, Skinner made a verbal offer to settle for the Wilts' "share of the Nickleson liability proceeds and $200,000 in UIM coverage." J.A. 1488. In a letter to Skinner dated February 25, 1988, counsel for State Auto recounted the February 24 discussions saying: "I contacted the company and advised them of your settlement demand which was $200,000." J.A. 114. The context shows that the $200,000 sum has reference only to the UIM coverage because State Auto already had decided to tender Nickleson's remaining liability limits ($97,000). As the district court held, counsel for State Auto rejected that demand for the reason that "[t]he company does not believe it has that amount of coverage available." J.A. 114.

On March 9, 1988, Skinner rejected State Auto's proposal of February 25 and asked State Farm to state its position on the amount of UIM coverage available to the Wilts. In so doing, Skinner explained his perception that:

> the Wilts have four separate automobile policies with State
> Auto, each of which has a 50,000 - 100,000 UM and IM
> coverages [sic]. The Wilts were not given an option to pur-
> chase the statutorily [sic] mandated 100,000- 300,000 UM

_____

**5** J.A. 128-32. These amounts are rounded to the nearest $100 and the claimants received interest on their respective shares.

6

coverage as required by W. Va. Code 33-6-31 [the section which governs underinsured and uninsured motorist coverage].

J.A. 116-17. This appears to be the genesis of the Wilts' view that their UIM coverage was $400,000 to $1.2 million, a position which Skinner maintained from that date forward.**6** And, their demands were at all times in that range.

State Auto's counsel, responded, on March 17, 1988, that, under the applicable statute, UIM coverage was available to the Wilts only if "payments to others injured in the accident reduce the limits of available coverage on the underinsured motor vehicle[Nickleson's car] to less than the limits the insured carried for underinsured motorist coverage." J.A. 118. State Auto's counsel suggested that, under the circumstances, Mrs. Wilt could receive the maximum UIM benefit ($50,000) if she would eschew any recovery under the Nickleson liability policy, leaving its proceeds to be divided among the other claimants which, of course, included Mr. Wilt. J.A. 119.

Negotiations between the parties on the issue of the Wilts' UIM coverage then reached a deadlock. And, on April 29, 1988, the Wilts filed a negligence action against the Nickleson estate in the Circuit Court of Jefferson County, West Virginia. Thus, as of the end of April

_____

**6** As made clear by subsequent correspondence between the parties, Skinner based that inflated view of the UIM coverage limits in reasoning that State Auto had failed to obtain a knowing and intelligent waiver of uninsured motorists coverage in the amount of $100,000/$300,000 as required by the statute. If that were true, those limits would be included in the policy by operation of law. See Bias v. Nationwide Mut. Ins. Co., 365 S.E.2d 789, 791 (W. Va. 1987). Skinner argued that, by analogy, State Auto likewise was obligated to provide those same limits in UIM coverage because the policy combined the premium for UM and UIM coverage. Skinner reached the $400,000/$1.2 million figure by "stacking" the $100,000/$300,000 limits for each of the four vehicles covered by the policy.

Skinner later asserted that McCune had agreed to the proposal made verbally on February 24, but McCune's letter of February 25 actually rejected the offer. (J.A. 114, 116).

1988, two actions were pending before the state court: State Auto's interpleader action and the Wilts' negligence action. An internal State Auto memorandum dated June 8, 1988 contains the notation: "Atty McCune [State Auto's counsel] & Skinner are still fighting it out on UM/UIM stacking." J.A. 214. The record does not disclose the progress of the state court actions, or of the negotiations respecting them, in the ensuing twenty-four months.

C. The Evolving Legal Landscape of West Virginia's UIM Law

However, during 1990, the Supreme Court of Appeals of West Virginia clarified the rules respecting UIM coverage under West Virginia's insurance law, thereby changing significantly the legal principles which lay at the core of the disagreement between the Wilts and State Auto about the Wilts' UIM coverage. Those decisional developments, therefore, require explication.

On July 20, 1990, the Court decided State Automobile Mutual Insurance Co. v. Youler, 396 S.E.2d 737 (W. Va. 1990), which addressed two aspects of UIM coverage law that were implicated in the Wilts' ongoing dispute with State Auto: (1) the validity of anti-stacking provisions applicable to UIM coverage; and (2) the triggering and computation of UIM coverage under the statute which required insurers to offer UIM coverage as an option.

First, Youler changed the rules respecting anti-stacking provisions. Before Youler, the West Virginia decisional law was that anti-stacking provisions applicable to uninsured motorist coverage were void and that, therefore, an individual who had UM coverage under multiple policies could collect up to the total limit of all policies without regard to an anti-stacking provision. See Bell v. State Farm Mut. Auto. Ins. Co., 207 S.E.2d 147, 151 (W. Va. 1974). However, West Virginia decisions reflected a contrary rule with respect to anti-stacking provisions in automobile liability insurance coverage, and the rule was that contractual anti-stacking provisions were to be given effect in policies of that kind. See Shamblin v. Nationwide Mutual Ins. Co., 332 S.E.2d 639, 645-46 (W. Va. 1985). Youler held that, with respect to anti-stacking provisions, UIM coverage was more analogous to the UM coverage in Bell than the liability coverage at issue in Shamblin. See 396 S.E.2d at 746. Consequently, the Court con-

8

cluded that the anti-stacking provision in the particular UIM policies before it in Youler was void where the insured was "covered simultaneously by two or more uninsured or underinsured motorist policy endorsements." Id. (emphasis added). However, and significantly for this case, in Youler, the Court declined to address the legal status of an anti-stacking provision, such as the one in the State Auto-Wilt contract, which involved a single policy covering multiple vehicles with a multi-car discount.[7]

Second, Youler also was significant to the State Auto-Wilt dispute over UIM coverage because, wholly apart from the decision on the anti-stacking provision, the Court addressed the triggering and computation of UIM coverage under the version of W. Va. Code § 33-6-31(b) in effect in 1988, which required insurers in West Virginia to offer optional UIM coverage. That statute, the Court held in Youler, embodied the "excess-type" or "floating-layer" approach to UIM coverage, whereby "the tortfeasor's liability insurance coverage is to be set off against the amount of damages sustained by the injured person, not against the underinsured motorist coverage limits." Id.[8] There-

_____

[7] Notably, two years after its decision in Youler, the Supreme Court of Appeals of West Virginia addressed the validity of anti-stacking language in a single policy that: (a) provided UIM coverage for multiple vehicles; and (b) contained a multi-car discount. See Russell v. State Auto. Mut. Ins. Co., 422 S.E.2d 803 (W. Va. 1992). In Russell, the Court explained that "the Youler decision does not govern the instant situation where only one policy is involved," and held that the anti-stacking provision was valid under that circumstance. Id. at 806. Like the facts in Russell, this action involved only one policy that covered multiple vehicles. This fact is significant because it demonstrates the ambiguity that remained in West Virginia's insurance law even after Youler. As will be seen, it was in the shadow of this ambiguity that the parties proceeded to negotiate following Youler and through the Spring of 1991.

[8] The version of W. Va. Code § 33-6-31(b) in effect at the time of the accidents in Youler and in this action defined an underinsured vehicle as:

> a motor vehicle with respect to the ownership, operation, or use of which there is liability insurance applicable at the time of the accident, but the limits of that insurance are either (I) less than limits the insured carried for underinsured motorists' coverage, or (ii) has [sic] been reduced by payments to others injured in the

9

upon, the Court announced the following formula for computing UIM coverage:

> [T]he total amount of damages, reduced by the liability insurance coverage actually available to the injured person in question; the insurer providing underinsured motorist coverage is liable for the excess or uncompensated damages up to the underinsured motorist coverage limits.

Id. at 749. However, the decision in Youler explicitly was confined to the situation in which the UIM limits in the injured plaintiff's policy indisputably exceeded the tortfeasor's liability limits. See id. at 749 n.13. In Youler, the Court was not confronted with, and thus it specifically declined to address, whether the underinsured motorist statute, W. Va. Code § 33-6-31(b), recognized "underinsured motor vehicle status" when the plaintiff's UIM coverage was equal to, or less than, the tortfeasor's liability limits, but the plaintiff's damages exceeded the latter's limits, a question over which the Wilts and State Auto were still at odds. Id.

The Court reached that issue nearly five months later, on December 14, 1990, in Pristavec v. Westfield Insurance Co., 400 S.E.2d 575 (W. Va. 1990). In Pristavec, the plaintiff had UIM coverage limits of $100,000, the tortfeasor had liability limits of $100,000, and it was alleged that the tortfeasor caused the plaintiff damages in excess of $200,000. See id. at 577. The Court rejected the UIM carrier's argument that, under this scenario, the tortfeasor was not an underinsured motorist for purposes of § 33-6-31(b) merely because the UIM and the liability limits were the same. The Court reasoned that an individual is an underinsured motorist, so as to trigger the Youler computa-

_____

> accident to limits less than limits the insured carried for underinsured motorist's coverage.

1493 (citations omitted); see Youler, 396 S.E.2d at 745. Section 33-6-31(b) was amended in 1988 to explicitly preclude "setoffs" of liability insurance coverage against UIM coverage limits but, of course, that amendment was not in effect at the time of the operative facts of this case and therefore has no bearing on the validity of the parties' respective bargaining positions.

10

tion method, when "the amount of the tortfeasor's motor vehicle liability insurance <u>actually available to the injured person in question</u> is less than the amount of damages sustained by the injured person, regardless of whether such liability insurance limits actually available are less than the underinsured motorist coverage limits." <u>Id.</u> at 578 (emphasis added).

In sum, the July 1990 decision in <u>Youler</u> provided only minimal guidance for the situation then facing State Auto and the Wilts. Not until the decision in <u>Pristavec</u>, in December 1990, did the Supreme Court of Appeals of West Virginia hold that UIM coverage was triggered when the insured's damages exceeded the available liability coverage. After <u>Pristavec</u>, then, the applicability of the <u>Youler</u> method of computation to the Wilts' claim for UIM benefits was settled, but the limits of that UIM coverage (<u>e.g.</u>, whether the limit was $50,000, $200,000 or even $400,000/$1.2 million, as the Wilts had suggested previously) was still unclear. Whether, and under what circumstances, a UIM anti-stacking provision such as that in the Wilts' policy was valid would remain unanswered for two more years, until the decision in <u>Russell</u> on June 29, 1992, <u>see</u> J.A. 160, 164; <u>supra</u> n.7.

D. <u>The Post-1990 Developments</u>

It was in that evolving legal landscape that negotiations resumed and State Auto re-examined the positions it previously had taken with the Wilts. The earliest record evidence on this score is a letter dated November 21, 1990 from Jack Kowalczyk, State Auto's corporate claim consultant, to Dale Buck, State Auto's counsel in the Wilts' negligence action. J.A. 120. That letter expressed Kowalczyk's agreement with the conclusions set out in a report dated November 1, 1990, wherein Buck apparently had concluded that the total UIM coverage available to the Wilts was $200,000. Kowalczyk's letter also stated that "[w]e are not prepared to increase the[sic] Wilts' UIM coverage to $400,000 as Skinner proposes," thereby reflecting that the Wilts' bargaining position as of October 1990 was that they were entitled to $400,000 in UIM coverage (a contention that Skinner first had made in March 1988). <u>Id.</u> Kowalczyk also explained that: "[u]ntil the court distributes the $97,000 already paid to it, we really do not know how to handle the Wilts' UIM coverage, although, I am prepared to pay up to $200,000 to the Wilts for a full and final release." <u>Id.</u>

11

Negotiations resumed in earnest in February 1991. By then, State Auto was represented by additional counsel, Water M. Jones, III, in a different firm.**9** On February 21, 1991, Jones gave an opinion to State Auto that the value of the Wilts' personal injury claim was between $170,000 and $200,000. J.A. 179-81. Kowalczyk gave Jones settlement authority of $165,000. However, in a March 6, 1991 letter, Jones only offered the Wilts $155,000 to settle their entire claim. J.A. 121, 733-37, 848-50. By letter dated March 12, 1991, Skinner: (1) rejected that offer; and (2) put forth a counter-proposal that "Mrs. Wilt will settle her case for policy limits, whatever that may be determined to be." J.A. 176. Skinner made an additional demand that "Mr. Wilt is willing to negotiate his claim on an individual basis." Id.

Thereafter, in a letter to Skinner dated March 15, 1991, State Auto's counsel, Buck, acknowledged that, under the Youler and Pristavec decisions, the Wilts had $200,000 available in UIM coverage and asked whether Skinner agreed. J.A. 142. On March 21, 1999, Skinner replied that he did not, reasserting instead the theory (first suggested in his letter to Buck of March 9, 1988) that, under the decision in Bias v. Nationwide Mutual Insurance Co. , 365 S.E.2d 789 (W. Va. 1987), the UIM limits were $400,000 to $1.2 million. J.A. 143; see supra n.6. Recognizing the impasse, Skinner asked State Auto to amend the declaratory judgment action "to deal with this question." J.A. 143. State Auto rejected Skinner's new demand, and the impasse over the UIM question continued.

Then, on April 18, 1991, Skinner issued a proposal to settle Mrs. Wilt's claim for $950,000 and Mr. Wilt's claim for $120,000, a demand totaling $1,070,000 which exceeded by a factor of five the UIM coverage which State Auto considered to be available to the Wilts. J.A. 152. State Auto understandably rejected that proposal, but it offered to pay $200,000, which was, at the time, the insurer's perception of the UIM policy limit. J.A. 140. On May 11, 1991, Skinner

_____

**9** The record reflects that State Auto's original counsel expressed concern over potential conflicts of interest and the appearance of impropriety because counsel was representing State Auto on the action against the Nickleson estate and in the action brought by the Wilts. Whatever may be said of that set of circumstances is of no moment in the resolution of this appeal.

12

responded by rejecting that offer, reiterating Mrs. Wilt's willingness to settle her claim "for the policy limits ... as it [sic] may finally be determined," and proposing that Mr. and Mrs. Wilts' claims be settled for $110,000 and $900,000, respectively. J.A. 140.

In June 1991, recognizing that further negotiations would not breach this vast gap in positions, State Auto amended its complaint in the interpleader action to seek a declaratory judgment as to the amount of UIM coverage available to the Wilts under West Virginia law. J.A. 144-51. Thereafter, on September 3, 1991, with the hearing on the declaratory judgment action approaching, State Auto offered to settle Mrs. Wilt's claim for whatever the Circuit Court found the limits of the UIM policy to be, up to $400,000. J.A. 153.[10] Subsequent communications between the parties show that, by this offer, State Auto intended for the proposed settlement of Mrs. Wilt's claim for policy limits to subsume Mr. Wilt's claim for loss of consortium. J.A. 249. The Wilts declined this offer.

Then, by Order dated September 24, 1991, the state court decided State Auto's interpleader/declaratory judgement action by rejecting the Wilts' Bias argument and holding that the Wilts' UIM coverage would be stacked, resulting in policy limits of $200,000 ($50,000 x the four vehicles covered under the Wilt policy). J.A. 154-57. Neither party appealed that decision.[11] Three days later, on September 27, 1991, State Auto filed a $200,000 offer of judgment in the Wilts' negligence action against the Nickleson estate. J.A. 158.

At this point, it is to be remembered that, on December 2, 1991, an Agreed Order was entered providing for a division of the $97,000 balance of the Nickleson liability policy. J.A. 128. Then, on December 18-20, 1991, rather than taking a judgment against State Auto in

_____

[10] The record reflects some confusion whether that offer previously had been communicated to Skinner. State Auto's counsel, Dale Buck, believed that it had been made verbally. Skinner asserted that it had not. J.A. 251-52. Hence, Buck sent the confirming letter of September 3, 1991.

[11] On June 29, 1992, in Russell, 422 S.E.2d 803, the Supreme Court of Appeals of West Virginia, cast substantial doubt on the correctness of that decision.

13

the amount of the offer of judgment, the Wilts tried their personal injury action to a jury. Unremarkably, the jury found that Charles W. Nickleson, Jr. had been negligent. On appeal, the Supreme Court of Appeals of West Virginia, reduced hedonic damages and the Wilts were awarded damages in the amount of $1,308,361.41, of which $1,000,000 was for punitive damages. The Supreme Court of the United States denied certiorari in May 1994. See Buracker v. Wilt, 511 U.S. 1129 (1994).

In 1992, after the jury verdict in December 1991 and while the case against the Nickleson estate was on appeal, the state court in the inter-pleader/declaratory judgment action initiated by State Auto was asked to reconsider its ruling respecting the UIM coverage issue and to award attorney fees to the Wilts. In a letter to the parties dated October 15, 1992, and in an order entered November 13, 1992, the state court affirmed its previous coverage ruling that the Wilt policy provided $200,000 in coverage limits. J.A. 159-65. The court also rejected the Wilts' requests for attorneys fees and costs, holding that:

> The Court also considered the motion by the Wilts for recovery of attorneys fees and costs expended in this inter-pleader and declaratory judgment action. Whereupon the Court finds, as a matter of fact, that the Wilts have maintained throughout the entire period of litigation that there is considerably more than $200,000.00 in underinsured motorist coverage available to them and further the Court finds, as a matter of uncontroverted fact, that prior to the amendment of the instant interpleader action to seek a declaratory judgment determining the limits of underinsured motorist coverage available to the Wilts, State Auto offered to settle this matter for $200,000.00, and the Court further finds that said offer was refused. It is further found as a matter of fact that on September 27, 1991 State Auto filed an offer of judgment in the underlying tort action of Wilt v. Buracker, Jefferson County Action 88-C-186, in the amount of $200,000.00 in compliance with this Court's Order of September 24, 1991, and therefore, as a matter of law, the Wilts cannot be said to have "substantially prevailed" and they are, as a matter of law, not entitled to recovery of attorneys fees and costs.

14

J.A. 161 (emphasis added). Neither party appealed this Order.

Three years later, on or about November 20, 1995, the Wilts instituted this action in the Circuit Court of Jefferson County, West Virginia. J.A. 11-25. State Auto removed the action to federal court on diversity jurisdiction, and the district court granted State Auto's motion for summary judgment on October 30, 1997. This appeal followed.

## II.

The Wilts' appeal presents two issues for review. First, the Wilts argue that the district court erred as a matter of law in granting summary judgment for State Auto on the common law claim, predicated on the decisions in Shamblin v. Nationwide Mutual Insurance Co., 396 S.E.2d 766 (W. Va. 1990), and Marshall v. Saseen, 450 S.E.2d 791 (W. Va. 1994), in which the Wilts asserted that State Auto acted in bad faith in refusing to settle the Wilts' personal injury claims for $200,000, the amount determined to be the UIM policy limits. Second, the Wilts contend that the district court erred in determining that they did not "substantially prevail" against State Auto, and in denying, pursuant to that determination, the claim for attorney's fees, net economic losses, and damages for annoyance and inconvenience under Hayseeds, Inc. v. State Farm Fire & Casualty, 352 S.E.2d 73 (W. Va. 1986). We review the grant of summary judgment de novo, applying the same standard as did the district court. See Wagner v. Wheeler, 13 F.3d 86, 90 (4th Cir. 1993).

## A.

Under the law of West Virginia, an insurer, which has the opportunity to settle a claim against its insured within policy limits and fails to do so, may be liable to the insured for the portion of a verdict in excess of that limit. See Shamblin, 396 S.E.2d 766. In Shamblin, the Supreme Court of Appeals of West Virginia held that:

> wherever there is a failure on the part of an insurer to settle within policy limits where there exists the opportunity to so settle and where such settlement within policy limits would

15

> release the insured from any and all personal liability, that
> the insurer has prima facie failed to act in its insured's best
> interest and that such failure to so settle prima facie consti-
> tutes bad faith towards its insured.

Id. at 776. The insurer then bears the "burden to prove by clear and convincing evidence that it attempted in good faith to negotiate a settlement, that any failure to enter into a settlement where the opportunity to do so existed was based on reasonable and substantial grounds, and that it accorded the interests and rights of the insured at least as great a respect as its own." Id.

The test for assessing whether an insurer has failed to meet this burden, and therefore is liable to its insured for liability in excess of the policy limits, was stated in Shamblin as follows:

> whether the reasonably prudent insurer would have refused
> to settle within policy limits under the facts and circum-
> stances of the case, bearing in mind always its duty of good
> faith and fair dealing with its insured.

Id. And, "[a]ny salient fact or circumstance regarding the reasonable-ness of the insurer's actions, and its concern or lack of concern for the protection of its insured, may be considered in determining whether the insurer is liable ...." Id. at 777. To this end, the Shamblin court explained one important caveat. Failure to satisfy Shamblin's strictures will render the insurer liable for the verdict-policy limit differential, but only upon proof of a "meaningful offer of settlement." Id. Thus, in Shamblin, where there existed a legitimate legal dispute as to the amount of coverage, the Court explained that "[n]either party should have been forced to adopt a position which would waive its rights on that issue." Id. Shamblin involved property damage claims, but the so-called "Shamblin" theory has been extended to claims for personal injury as well. Marshall, 450 S.E.2d at 798.

In Marshall, the Supreme Court of Appeals of West Virginia extended the Shamblin theory of recovery to first party claims by an insured pursuant to the UIM coverage provision of the insured's policy. See 450 S.E.2d 791. In Marshall, the Court held that: (1) "where an uninsured or underinsured motorist insurance carrier fails to settle

16

within its policy limits, it may be liable in a separate suit for the excess verdict returned by a jury for its failure to make a good faith settlement within its policy limits"; and (2) the principles set out in Shamblin govern such a claim. Id. at 798.

In the district court, the Wilts alleged that, pursuant to Shamblin and Marshall, the failure of State Auto to settle their claim within the policy limits of their UIM policy exposed State Auto to liability for the difference between the jury verdict that the Wilts recovered against Nickleson's estate and the amount available to them under their UIM policy. The district court granted summary judgment on that claim in favor of State Auto because it found that the fundamental element of a Shamblin claim -- that the insurer refused to settle within policy limits -- was lacking, and because the record of State Auto's conduct during the February-March 1988 negotiations and during the Spring 1991 negotiations did not evidence bad faith, within the meaning of Shamblin.

Having reviewed the record, the briefs and the applicable law and having considered the arguments of counsel, we conclude that the district court correctly granted summary judgment on that claim, and we adopt the reasoning of the district court as our own on that aspect of the Wilts' appeal.**12**

_____

**12** We note the Wilts' argument that the district court failed to assess the impact of an alleged conflict of interest in its Shamblin calculus. The Wilts argue that State Auto's bad faith can be inferred from the fact that State Auto's attorney, William R. McCune, had a conflict of interest by representing State Auto in the interpleader action and by filing an Answer in the underlying negligence action on behalf of the Nickleson estate. We fail to see how any such conflict, if indeed McCune's work amounted to that, in any way raises an issue of fact on the bad faith issue as presented by the record in this action. McCune at all times represented entities adverse to the Wilts. Moreover, there is no nexus between the events that allegedly were infected by McCune's alleged conflict, both of which took place in 1988, and with the negotiating positions taken by State Auto three years later, in the spring of 1991.

B.

Under West Virginia law, whenever a policyholder must sue his own insurance company, and the policyholder "substantially prevails" in the action, the insurer is liable for the payment of the policyholder's reasonable attorney's fees, other economic loss caused by the delay in settlement, and damages proven for the policyholder's aggravation and inconvenience. See Hayseeds, 352 S.E.2d at 80. The Supreme Court of Appeals of West Virginia has held that the same components of damages may be recovered by substantially prevailing UIM claimants. See Marshall, 450 S.E.2d at 797; see also Miller v. Fluharty, 500 S.E.3d 310, 318 (W. Va. 1997) ("When an insurance carrier refuses to pay any type of first-party claim (including a claim for underinsurance benefits), the policyholder may be compelled to participate in lengthy, costly litigation to cover the insurance policy proceeds.").

Relying on Hayseeds and Marshall, the Wilts sought recovery from State Auto of attorney's fees, and economic loss, and annoyance damages. The parties filed cross-motions for summary judgment on this theory of recovery. Citing syllabus points 1 and 2 of the decision in Hadorn v. Shea, 456 S.E.2d 194 (W. Va. 1995), the district court framed the relevant inquiry as follows:

> The question of whether an insured has substantially prevailed against his insurance company on a property damage claim is determined by the status of negotiations between the insured and the insurer prior to the institution of the law suit. Where the insurance company has offered an amount materially below the damage estimates submitted by the insured, and the jury awards the insured an amount approximating the insured's damages, the insured has substantially prevailed. Syl. pt. 2, Thomas v. State Farm Mut. Auto. Ins. Co., 181 W.Va. 604, 383 S.E.2d 786 (1989).
>
> An insured substantially prevails in a property damage action against his or her insurer when the action is settled for an amount equal to or approximating the amount claimed by the insured immediately prior to the commencement of the action, as well as when the action is concluded

18

by a jury verdict for such an amount. In either of these situations the insured is entitled to recover reasonable attorney's fees from his or her insurer, as long as the attorney's services were necessary to obtain payment of the insurance proceeds. Syl. pt. 1, Jordan v. Nat'l Grange Mut. Ins. Co., 183 W.Va. 9, 393 S.E.2d 647 (1990).

J.A. 1502 (quoting Hadorn, 456 S.E.2d at 195).

Within that analytical framework the district court held that: (1) the Wilts' claim for Hayseeds damages, like their bad faith/excess verdict claim, failed in light of Shamblin's [ ] "meaningful offer" requirement; and (2) "[a]dditionally -- and irrespective of whether the absence of a meaningful offer under [Shamblin ] precludes an insured from recovering attorney fees and expenses -- the Wilts are not entitled to Hayseeds damages because they did not substantially prevail." J.A. 1504. For those reasons, the district court granted summary judgment in favor of State Auto the Wilts' claim for"Hayseeds" damages.

On appeal, the Wilts argue that the district court mistakenly applied the Hayseeds test to the interpleader/declaratory judgment action, not the underlying negligence case, and that the district court erroneously imported a Shamblin "meaningful offer"/bad faith requirement into the Hayseeds inquiry. Finally, comparing the February 1988 demand which was made on State Auto to settle the claim for UIM coverage for $200,000 with the jury's verdict of more than $1.3 million in their action against Nickleson's estate, the Wilts contend that they "substantially prevailed" against State Auto as a matter of law.

We note at the outset our disagreement with the Wilts that the appropriate baseline by which to determine whether Hayseeds damages are recoverable in this action is the underlying negligence action, rather than the interpleader/declaratory judgment action. That the Wilts prevailed against the Nickleson estate in the negligence action is irrelevant to their claim for Hayseeds damages. State Auto conceded, as all parties did, that Nickleson was responsible for the accident, and it promptly filed an interpleader action and tendered for disposition therein the limits of Nickleson's liability policy.

The gravamen of a Hayseeds claim is that the insured has been required needlessly to incur expenses and damages to secure a cover-

19

age right for which the insured had contracted. Thus, a <u>Hayseeds</u> claims focuses on the dispute between insurer and insured over the insured's policy limits. Therefore, the action in which the Wilts needed to "substantially prevail" was the declaratory judgment action which determined the limits of their UIM coverage. Indeed, <u>Marshall</u>, one of the decisions on which the Wilts principally rely, expressly holds that <u>Hayseeds</u> damages are available "when a policyholder of uninsured or underinsured motorist coverage ... substantially prevails <u>in a suit involving such coverage</u>." <u>Marshall</u>, 450 S.E.2d at 797 (emphasis added).

With that in mind, the district court determined whether the Wilts prevailed on their claim for <u>Hayseeds</u> damages by assessing the status of the offer and demands respecting UIM coverage extant in the Spring of 1991, "at the time negotiations broke down." However, the district court also expressly declared that it would "look to the post-filing status of negotiations" in making that determination. J.A. 1504 n.7. That approach was taken because it was taught by the decision in <u>Hadorn</u>, 456 S.E.2d at 194, the controlling decision when the district court granted summary judgment in October 1997.

Thereafter, on December 16, 1997, the Supreme Court of Appeals of West Virginia announced a more liberal standard for evaluating whether a <u>Hayseeds</u> claimant "substantially prevailed" against his insurer:

> When examining whether a policyholder has substantially prevailed against an insurance carrier, a court should look at the <u>negotiations as a whole from the time of the insured event to the final payment of the insurance proceeds</u>. If the policyholder makes a reasonable demand during the course of negotiations, within policy limits, the insurance carrier must either meet that demand, or promptly respond to the policyholder with a statement why such demand is not supported by the available information.
>
> * * *
>
> Whether a policyholder has substantially prevailed is determined by <u>looking at the totality of the policyholder's negoti-</u>

20

ations with the insurance carrier, not merely the status of
negotiations before and after a lawsuit is filed.

Miller, 500 S.E.2d at 313, 321 (syllabus pt. 4) (emphasis added).**13**
Miller, of course, supplies the controlling rule of law for it is the law
in effect at the time of decision on appeal. See Thorpe v. Housing
Auth. of Durham, 393 U.S. 268 (1969); West v. Anne Arundel Coun-
try, MD, 137 F.3d 752, 762 (4th Cir.), cert. denied, 119 S. Ct. 607
(1998).

Often under this circumstance, it is appropriate to remand the issue
for decision by the district court. However, where, as here, the record
is fully developed and the issue has been adequately briefed, we can
apply the new decision to the facts and decide the issue on appeal. See
De Nobel v. Vitro Corp., 885 F.2d 1180, 1186 (4th Cir. 1989). To that
task we now turn, and we find that application of the Miller principles
to the fully developed record here yields the same result as the assess-
ment made by the district court -- the Wilts did not substantially pre-
vail in their action against State Auto.**14**

The insured event was May 3, 1986. Negotiations about the avail-
ability and the amount of UIM coverage did not start until after Skin-
ner was retained to represent the Wilts on September 24, 1986. On
October 29, 1986, State Auto informed Skinner of its view on the
amount of the Wilts UIM coverage and the circumstances under
which that coverage would be available. Considering the then current
state of West Virginia decisional law and the text of the UIM statute,**15**

_____

**13** Miller involved a UIM policyholder who waited until after he filed
a lawsuit against the tortfeasor to make a demand against his UIM pol-
icy. The Supreme Court of Appeals modified its previous decisions on
the measurement of "substantially prevailed," which had instructed
courts to look only at "the status of negotiations between the insured and
the insurer prior to the institution of the law suit." Hadorn, 456 S.E.2d
at 195 (syllabus pt. 1). Contrary to the contentions of the Wilts, we find
that the Miller standard is generally applicable and not confined to situa-
tions where a demand is made only after the commencement of a lawsuit.
**14** Indeed, because the district court took into account negotiations
which occurred after the declaratory judgment action was filed, its analy-
sis is not materially different than ours. J.A. 1504-05.
**15** See discussion, Part IC, supra.

both of which were cited as reasons for State Auto's position, that was a reasonable interpretation of the UIM coverage provision in the Wilts' policy.

Negotiations resumed on February 24, 1988 when Skinner and State Auto's counsel met to discuss settlement. The district court found that Skinner made a demand to settle for the Wilts' share of the Nickleson liability policy and $200,000 in UIM coverage. Although the UIM aspect of that demand was within what the state court determined to be the policy limits three years later, the demand considerably exceeded that which would have been suggested under a reasonable construction of West Virginia law as it stood in February 1988.

The next day State Auto again explained its position that $200,000 in coverage was not available, but offered to pay the Nickleson proceeds in any way agreeable to the claimants and stated that any releases by the Wilts "would specifically provide that any additional claims which the Wilts had against the estate of Charles Nickleson, to the extent that those claims are covered by other insurance, are not released." J.A. 114. Of course, the only "other insurance" being considered was the Wilts' UIM coverage. Thus, the insurer's response was that the Wilts would be free to pursue their theory that more than $50,000 was available.

On March 9, 1988, Skinner rejected that proposal and offered the view that the Wilts UIM coverage could range between $100,000 to $300,000 which, when stacked, would be $400,000 to $1.2 million. Considering the state of West Virginia decisional law at the time that cannot be considered a reasonable demand within policy limits.

A week later, State Auto responded with a reasonable counter-proposal by which it put on the table what it then perceived to be its entire UIM policy limit ($50,000) and suggested a mechanism by which Mr. and Mrs. Wilt could receive a significant share of the balance of the Nickleson policy ($97,000) as well as the full $50,000 UIM coverage.

The Wilts argue that they substantially prevailed because of the $200,000 demand that Skinner made on February 24, 1988. Accord-

22

ing to them, that was a reasonable demand within the policy limits. Whether a demand is reasonable depends at least in part upon the state of the law governing the coverage issue under dispute. Here a reasonable interpretation of state law permitted a view of the maximum UIM coverage that was less, by a factor of four, than the demand. And, even if such a demand were reasonable when made, Miller teaches that the insurer has two options:"meet that demand, or promptly respond to the policyholder with a statement why such demand is not supported by the available information." 500 S.E.2d at 313. State Auto followed the latter course. The day after that demand was made, it was rejected by State Auto, J.A. 114, as beyond the coverage limit. Twelve days thereafter, Skinner claimed to have interpreted that rejection to mean that the only insurance available was the Nickleson liability policy. That, of course, was not what the rejection letter said. Nor was that interpretation consistent with the position held by State Auto since October 1986 when it informed Skinner of its view on UIM coverage. J.A. 113.

In the same letter in which Skinner misinterpreted State Auto's position, he also put forward the theory that UIM coverage actually was from $400,000 to $1.2 million and then requested: "[p]lease advise me what State Auto's position is as to the coverage which is available to the Wilts." J.A. 117. As permitted by Miller, State Auto promptly responded with a statement why neither the $200,000 figure nor the $400,000-$1.2 million range was supported by the insurance policy terms or the applicable law. J.A. 118.

The totality of negotiations also includes the fact that, when the state law controlling significant aspects of State Auto's coverage position were resolved unfavorably to it in other cases, the insurer offered first $200,000 and then up to $400,000 (depending on the judicial determination of limits). From then until the state court decided that the limits were $200,000, the demands made by the Wilts were many multiples of $200,000 and thus were not within policy limits.

Hence, in light of the record as a whole, considering the negotiations in their totality "from the time of the insured event" until today, it cannot be said that the Wilts "substantially prevailed." We therefore affirm the district court's disposition of the Hayseeds issue by apply-

23

ing the test of <u>Miller v. Fluharty</u> to the undisputed factual record respecting the applicable analysis.**16**

III.

For the foregoing reasons, the judgment of the district court is

<u>AFFIRMED</u>.

_____

**16** We find it unnecessary to address State Auto's alternative argument that, under the preclusion doctrines of res judicata and collateral estoppel, the state court's determination in the declaratory judgment action that the Wilts did not "substantially prevail" forecloses them from bringing the <u>Hayseeds</u> claim in this action.

24